# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| VAYLA NEW ORLEANS, THANH MAI, FLORIDALMA MANSILLA, NORMA FLORES, on behalf of themselves and others similarly situated, | ) ) ) ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | |
| TOM SCHEDLER, in his official capacity as Louisiana Secretary of State, ANGIE ROGERS, in her official capacity as the Louisiana Commissioner of Elections, | ) ) ) ) | **CLASS ACTION** |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs request that this Court enter a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 directing Defendants to cease enforcement of LA. REV. STAT. ANN. § 18:105(B) ("Section 18:105(B)"). Section 18:105(B) discriminates against naturalized citizens by subjecting them to heightened voter registration requirements. In registering to vote, naturalized citizens must provide documentary proof of their U.S. citizenship while native-born citizens need not do so.

Section 18:105(B) suppresses the votes of Louisiana's naturalized citizens. Left in place, Section 18:105(B) will continue to result in irreparable harm to eligible voters' rights to participate in elections in Louisiana, including the upcoming presidential and Congressional elections on November 8, 2016. Plaintiffs are likely to prevail on the merits of their claims that Section 18:105(B) violates the Equal Protection Clause of the Fourteenth Amendment, violates 52 U.S.C. § 10101(a)(2)(A), and is preempted by the National Voter Registration Act. The

1

injury to Plaintiffs outweighs any impact the preliminary injunction may have on the state's proffered interests, and the injunction would serve the public interest.  For the reasons that follow, Plaintiffs ask the Court to enjoin Section 18:105(B) on a preliminary basis.  Given the fast-approaching voter registration deadline for this year's general election and the possibility of an interlocutory appeal under 28 U.S.C. § 1292(a)(1), Plaintiffs respectfully request that the Court enter an injunction before June 30, 2016.

## 1.  FACTUAL BACKGROUND

Laws targeting foreign-born, naturalized voters were once more common, but Louisiana appears to be the only state in the country still enforcing such a law.[1]  The courts have struck down such laws in other states.[2]  Section 18:105(B) persists, however, as a roadblock for innumerable naturalized Louisiana residents attempting to register to vote.

Plaintiffs Thanh Mai, Norma Flores, and Floridalma Mansilla were born in Vietnam, Guatemala, and Honduras, respectively, and each naturalized into citizenship.  Ex. 1 (Declaration of Thanh Mai ("Mai Decl.")) ¶ 1; Ex. 2 (Declaration of Norma Flores ("Flores Decl.")) ¶ 1; Ex. 3 (Declaration of Floridalma Mansilla ("Mansilla Decl.")) ¶¶ 1-2.  Plaintiffs Mai, Flores, and Mansilla have submitted voter registration forms a collective eight times, but they remain unregistered to vote due to Defendants' enforcement of Section 18:105(B).  Plaintiffs' first four

---

[1] Recently, a few states have enacted a documentary proof of citizenship requirement for voter registration but those state laws apply to native-born and naturalized U.S. citizens alike.  *See* ALA. CODE § 31-13-28; ARIZ. REV. STAT. § 16-166(F); GA. CODE ANN. § 21-2-216(g); KAN. STAT. ANN. § 25-2309.

[2] *See, e.g.*, *State ex rel. Williams v. Moorhead*, 96 Neb. 559, 148 N.W. 552, 557 (1914) (holding affidavit confirming details of naturalization suffices to rebut challenge to citizenship and documentary proof is unnecessary) ("We are unable to see how proof of this character will open the door to fraud where a naturalized citizen is attempting to register, any more than it would if one claiming to be native born were making application."); *Attorney General v. City of Detroit*, 78 Mich. 545, 561-64 (1889) (striking down Michigan's documentary proof of citizenship requirement for naturalized voters) ("This distinction between native-born and naturalized electors is an unfair one, and . . . entirely unnecessary in order to prevent fraud."); *id*. at 562 ("A law that treats these men as men whose oaths cannot be taken in their own interest, while it permits a native-born citizen to prove his standing as a voter by his own testimony, cannot receive my sanction, as I believe such a requirement to be not only unjust, but unconstitutional, unless applied to all."); *see also Kineen v. Wells*, 144 Mass. 497, 503 (1887) (striking down 30-day waiting period before naturalized citizens could register to vote).

attempts to register received no response from the Registrar's office, neither confirmation of registration nor the Section 18:105(B) notice to prove citizenship.  *See* Ex. 1 (Mai Decl.) ¶ 4; Ex. 2 (Flores Decl.) ¶ 7; Ex. 3 (Mansilla Decl.) ¶ 4.

Mai found out she was not registered when she was turned away from the voting booth when she tried to vote in the Fall 2015 election for Governor of Louisiana.  Ex. 1 (Mai Decl.) ¶ 5.  Flores and her U.S.-born son filled out voter registration forms together, mailing in their forms at the same time in different envelopes.  Ex. 2 (Flores Decl.) ¶ 7.  A few weeks later, Flores's son received a confirmation of voter registration while Flores received nothing.  *Id.*

Undeterred, Plaintiffs Mai, Flores, and Mansilla tried again to register to vote.  Mai next submitted *two* voter registrations – a National Mail Voter Registration Form ("Federal Form") and an online registration using Louisiana's web-based voter registration system – to ensure she would be registered to vote before Louisiana's presidential primaries.  Ex. 1 (Mai Decl.) ¶¶ 6-7.  Rather than a confirmation of registration, Mai received two letters from the Registrar of Voters requiring documentary proof of citizenship pursuant to Section 18:105(B).  *Id.* ¶¶ 8, 11 & Exs. A, C.  The day Mai was going to the Registrar's office with proof of citizenship, she saw there was a 10-day deadline to prove her citizenship, and she had already missed the window.  *Id.*

Defendants or their agents similarly discarded Flores's third registration due to her missing the 10-day window.  Ex. 2 (Flores Decl.) ¶¶ 10-11.  Receiving nothing in response to her first two attempts to register, Flores had submitted a third state voter registration form shortly before the presidential primaries.  *Id.* ¶¶ 7-9.  Several weeks later, Flores received a letter stating she had 10 days from February 16, 2016 to prove citizenship or her voter registration application would be rejected.  *Id.* ¶¶ 10-11 & Ex. A.  The 10-day window may have passed before she even received the letter, but once she received it, she was preparing for a trip and was unable to go to

the Registrar's office within 10 days of receiving the letter.  *Id.*  Mansilla similarly received a letter from a parish Registrar's office saying she would not be registered to vote unless she proved her U.S. citizenship.  Ex. 3 (Mansilla Decl.) ¶ 6 & Ex. A.  In their voter registration applications, Plaintiffs Mai, Flores and Mansilla each swore under penalty of perjury to being U.S. citizens and eligible to vote.  Ex. 1 (Mai Decl.) ¶¶ 6-7, 14; Ex. 2 (Flores Decl.) ¶¶ 7-9; Ex. 3 (Mansilla Decl.) ¶¶ 3-5.  They all remain unregistered.  Ex. 1 (Mai Decl.) ¶ 12; Ex. 2 (Flores Decl.) ¶ 14; Ex. 3 (Mansilla Decl.) ¶¶ 9-11.

Many naturalized citizens become discouraged from registering to vote due to Defendants' enforcement of Section 18:105(B).  Plaintiff VAYLA and Puentes, both non-profits devoted to civic empowerment in Louisiana, have engaged in voter registration activities since 2006 and 2007, respectively, but with minimal success in actually adding naturalized voters to the statewide voter registration system.  Ex. 4 (Declaration of Minh Nguyen ("Nguyen Decl.")) at ¶¶ 4-21; Ex. 6 (Declaration of Carolina Hernandez ("Hernandez Decl.")) ¶¶ 4-6, 13-16, 19.  Despite these organizations' efforts to register naturalized citizens, "people were not registering to vote because of the proof of citizenship law."  Ex. 6 (Hernandez Decl.) ¶ 15.  Proving citizenship "is a hardship" for people who work during business hours, cannot drive, face language barriers, or feel "intimidated" by navigating bureaucracy.  Ex. 4 (Nguyen Decl.) ¶¶ 14-15, 17.  Many people subject to Section 18:105(B) do "not manage to get to the Registrar's office to finish registering."  Ex. 6 (Hernandez Decl.) ¶ 14.

In contrast to Plaintiffs' multiple unsuccessful efforts to register, native-born U.S. citizens can register to vote relatively easily.  *See* Ex. 9 (Declaration of Daniel Parker ("Parker Decl.")) ¶¶ 4-7; Ex. 10 (Declaration of Austin Rickel ("Rickel Decl.")) ¶¶ 4-7; Ex. 11 (Declaration of Leah Samuel ("Samuel Decl.")) ¶¶ 4-7.  Because Section 18:105(B)'s second-

4

step registration requirement only applies to people of non-U.S. national origin, native-born citizens do not have to present documentary proof of citizenship to register to vote.  *Ids.*  They simply sign the affirmation of U.S. citizenship under penalty of perjury that all registrants must sign and Defendants or their agents register them to vote.  *Ids.*

Section 18:105(B) has made third-party voter registration drives in communities with naturalized citizens complex, burdensome and costly.  VAYLA and Puentes were forced to divert money, staff and volunteer time and other resources – which could have been spent on other programs and initiatives – to comply with the proof of citizenship requirement in registering the community members they serve.  Ex. 4 (Nguyen Decl.) ¶¶ 7, 12, 14-15, 17-21; Ex. 5 (Declaration of Jeanna Tran ("Tran Decl.")) ¶¶ 1, 3, 9-10; Ex. 6 (Hernandez Decl.) ¶¶ 5-19.  VAYLA and Puentes staff have encountered rule variations from parish to parish, as state and local officials made it more difficult to conduct registration drives by failing to give public notice of the proof of citizenship requirement or by inconsistently applying the law.  Defendants' law is frustrating voter participation, as demonstrated by the experiences of Plaintiffs who only want to vote without overcoming discriminatory barriers.  *See, e.g.*, Ex. 1 (Mai Decl.) ¶¶ 12-14; Ex. 2 (Flores Decl.) ¶¶ 12, 14; Ex. 3 (Mansilla Decl.) ¶¶ 9-10; Ex. 7 (Declaration of Luba Sivakova) ¶¶ 6-9; Ex. 8 (Declaration of Irma Salinas) ¶¶ 4-7.

### LEGAL STANDARD FOR ISSUANCE OF PRELIMINARY INJUNCTION

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011).  As set forth in detail below, all four requirements are met here.

**2.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

In order to show a likelihood of success on the merits, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment."   *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).

Louisiana law requires each voter registration applicant to attest under penalty of perjury that she or he is a United States citizen.   LA. REV. STAT. ANN. § 18:104(A)(15).   In addition, naturalized U.S. citizen voter registration applicants with foreign birthplaces—*i.e.*, people with non-U.S. national origins—must prove their citizenship.   Louisiana statute § 18:105 states:

> B. (1) In addition to the proof otherwise required by this Section, an applicant of foreign birth who has been naturalized shall prove that he has been legally naturalized under the laws of the United States.
>
> (2) If he has never previously registered in the parish or is not at the time of the application registered in any other parish in the state, he shall present to the registrar either a certificate of naturalization under the seal of the court in which the naturalization took place, attested by the clerk of that court, or his current United States passport.
>
> (3) If he claims to be a naturalized citizen by reason of the naturalization of a parent and he has not been registered previously in the parish or is not at the time of application registered in any other parish in the state, he shall present to the registrar either the certificate of naturalization of the parent attested by the clerk of the court in which the naturalization took place or his current United States passport.

LA. REV. STAT. ANN. § 18:105(B).   However, native-born U.S. citizens are not required to provide documentary proof of citizenship in order to register to vote.   Louisiana has chosen to treat the two groups of citizens differently, expressly erecting a barrier in the voter registration process to those who became U.S. citizens by naturalization.   Defendants have instructed parish Registrars of Voters to enforce Section 18:105(B).   Ex. 4 (Nguyen Decl.) ¶ 13.

**a.   Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.**

The Equal Protection Clause of the Fourteenth Amendment commands that a state shall not "deny to any person within its jurisdiction the equal protection of the laws," U.S. CONST.,

amend. XIV, § 1, cl. 4, "which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). Native-born and naturalized U.S. citizens are, as a matter of law, similarly situated in all material respects because they are equally eligible to vote.  *See Schneider v. Rusk*, 377 U.S. 163, 165 (1964) ("[T]he rights of citizenship of the native born and of the naturalized person are of the same dignity and are coextensive.").[3]  Louisiana nonetheless has chosen to treat voter registration applicants differently based on whether they were native-born or foreign-born and naturalized.  This disparate treatment on the basis of national origin violates Plaintiffs' rights to equal protection.  *Hernandez v. Texas*, 347 U.S. 475, 482 (1954).

As a general matter, state legislation is presumed valid and will be upheld against an equal protection challenge so long as the classification drawn is rationally related to a legitimate state interest.  *See Cleburne*, 473 U.S. at 440.  That "general rule gives way, however," when a state classifies by race or national origin, as those immutable characteristics[4] "are so seldom relevant to the achievement of any legitimate state interest" that laws that distinguish on those bases are presumed to reflect "a view that those in the burdened class are not as worthy or deserving as others."  *Id.*  For that reason, "and because such discrimination is unlikely to be soon rectified by legislative means"—given that the discrimination typically targets discrete and insular minorities with little political power—such laws "are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest."  *Id.*; *see also Fisher v. Univ. of Texas at Austin*, 133 S. Ct. 2411, 2418 (2013) ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." (citations and quotation marks

---

[3] *See also Knauer v. United States*, 328 U.S. 654, 658 (1946); *Luria v. United States*, 231 U.S. 9, 22 (1913).
[4] *Garcia v. Gloor*, 618 F.2d 264, 269 (5th Cir. 1980) ("No one can change his place of birth (national origin). . . .").

omitted)).  Classifications based on national origin or ancestry are suspect and subject to strict scrutiny. *Graham v. Richardson*, 403 U.S. 365, 371-72 (1971); *Hernandez*, 347 U.S. at 482.

Section 18:105(B) singles out naturalized U.S. citizens for different treatment based on their non-U.S. national origins.  Defendants treat Plaintiffs differently than other U.S. citizens who have filled out voter registration forms and attested to being U.S. citizens solely because Plaintiffs were born outside the United States and naturalized into U.S. citizenship.

Plaintiff Mai has attempted to register to vote three times, but she cannot vote and remains unregistered due to Section 18:105(B).  Ex. 1 (Mai Decl.) ¶¶ 4-12 & Ex. D.  If she had been born in the United States rather than Vietnam and had not naturalized into citizenship, Plaintiff Mai would be registered to vote.  *See* Ex. 2 (Flores Decl.) ¶ 7; Ex. 9 (Parker Decl.) ¶¶ 4-7; Ex. 10 (Rickel Decl.) ¶¶ 4-7; Ex. 11 (Samuel Decl.) ¶¶ 4-7.  Plaintiffs Flores and Mansilla have submitted voter registration applications a combined five times, but they remain unregistered to vote due to Section 18:105(B) because they were born in Honduras and Guatemala, respectively, and naturalized into citizenship.  Ex. 2 (Flores Decl.) ¶¶ 1, 7-12, 14; Ex. 3 (Mansilla Decl.) ¶¶ 1, 4-6, 11; Ex. 12 (Declaration of Sara Godchaux ("Godchaux Decl.") ¶¶ 3-4 & Exs. A & B.

Plaintiffs have worked hard to become U.S. citizens.  They have paid high fees, taken classes, passed a test, and have sworn to support the United States.  *See* Ex. 2 (Flores Decl.) ¶ 3; Ex. 3 (Mansilla Decl.) ¶ 2.  Each Plaintiff has undertaken this long process in order to realize the promise of naturalization: becoming a full "member of the society, possessing all the rights of a native citizen, and standing, in the view of the constitution, on the footing of a native." *Osborn v. Bank of United States*, 22 U.S. 738, 827 (1824).  Yet Defendants' enforcement of Section 18:105(B) denies them equal treatment and equal dignity, treating as suspect their attestations of

8

the U.S. citizenship that they worked so hard to earn, and erecting a barrier to their exercise of one of the most precious rights they have earned: their "constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).

Because it classifies and discriminates on the basis of national origin—to say nothing of its impact on the fundamental right to vote—Section 18:105(B) is subject to strict scrutiny. *Hernandez*, 347 U.S. at 482; *Fernandez v. Georgia*, 716 F. Supp. 1475, 1478-79 (M.D. Ga. 1989) (invalidating, under strict scrutiny, state law excluding naturalized citizens from serving as state troopers). To survive strict scrutiny, Defendants must prove that their disparate treatment of naturalized citizens is necessary to accomplish a compelling state interest. *Fisher*, 133 S. Ct. at 2418-20. Defendants cannot carry their heavy burden. Regardless of the interest the Defendants put forward, Section 18:105(B) cannot survive strict scrutiny because the law is not narrowly tailored. *See Boustani v. Blackwell*, 460 F. Supp. 2d 822, 823-27 (N.D. Ohio 2006) (enjoining polling place procedure which would require challenged naturalized voters to produce their naturalization certificates, while not requiring any proof from native-born citizens, as violation of the Equal Protection Clause). In fact, every other state in the country maintains its voter rolls without singling out naturalized citizens to show their papers to a Registrar on top of attesting to their eligibility to vote, demonstrating that Louisiana's discriminatory practice is not "the least restrictive means" of achieving any permissible purpose. *Hatten v. Rains*, 854 F.2d 687, 690 (5th Cir. 1988).

Indeed, Defendants' law could not even survive rational basis review. There is no rational basis to disbelieve the sworn attestations of naturalized U.S. citizens, while taking at face value the identical attestations of native-born citizens. Both groups attest to the same

9

material facts—place of birth, U.S. citizenship and eligibility to vote—under penalty of criminal prosecution.  Defendants' law is nonetheless based on the premise that the sworn statements of naturalized U.S. citizens are less credible.  Such a premise is without a rational basis.  *See, e.g.*, *Schneider*, 377 U.S. at 168 (holding unconstitutional a statute premised on "the impermissible assumption that naturalized citizens as a class are less reliable and bear less allegiance to this country than do the native born");[5] *cf. Huynh v. Carlucci*, 679 F. Supp. 61, 67 (D.D.C. 1988) ("this Court is hard put to find even a rational basis for the Regulation" denying security clearance to naturalized U.S. citizens).  Section 18:105(B) offends the constitutional promise that "[c]itizenship obtained through naturalization is not a second-class citizenship."  *Knauer*, 328 U.S. at 658.

In sum, Plaintiffs are likely to succeed on their claim that a proof of citizenship requirement against naturalized citizens with non-U.S. national origins, such as Plaintiffs Mai, Flores and Mansilla, violates the Equal Protection Clause.

**b.  Plaintiffs Are Likely to Succeed on Their 52 U.S.C. § 10101(a)(2)(A) Claim.**

52 U.S.C. § 10101[6] traces its origin to the Enforcement Act of 1870, also known as the First Ku Klux Klan Act.[7]  It was subsequently amended several times and Title III of the Civil Rights Act of 1964 added the following section which is the basis for Plaintiffs' second claim:

> (2) No person acting under color of law shall-- (A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote[.]

---

[5] In the late 19th Century and early 20th Century, a number of state supreme courts struck down documentary proof of citizenship requirements that only applied to naturalized U.S. citizens registering to vote and similar discriminatory measures.  *See supra* n.4.

[6] Until recently, when all federal election laws were transferred to Title 52 of the United States Code, this statute was codified as 42 U.S.C. § 1971.

[7] 41 Cong. Ch. 114, 16 Stat. 140 (1870).

52 U.S.C. § 10101(a)(2)(A).

Section 18:105(B)'s proof of citizenship requirement for naturalized U.S. citizens registering to vote is a "standard, practice, or procedure" which is "different from the standards, practices, or procedures applied" to native-born applicants. Assuming they meet the other voting eligibility criteria in LA. REV. STAT. ANN. § 18:101, native-born U.S. citizens are deemed qualified to vote based on the information they provide and swear to under penalty of perjury in the voter registration application. Naturalized applicants must provide documentary proof of one of the voting eligibility criteria. Such discriminatory treatment is prohibited, since both categories of U.S. citizens are equally eligible to vote under Section 18:101 and, therefore, the standards, practices and procedures applied must be nondiscriminatory.

Cases under 52 U.S.C. § 10101(a)(2)(A) are rare because discrimination in registration procedures has long been outlawed. In *Frazier v. Callicutt*, 383 F. Supp. 15 (N.D. Miss. 1974), the court granted an injunction against local election officials on Fourteenth Amendment and 52 U.S.C. § 10101(a)(2)(A) grounds. *Id*. at 16, 20. The plaintiffs introduced evidence that "the registrar [had] applied one set of standards in approving or disapproving applications for registration to applicants who are students at Rust College or Mississippi Industrial College . . . and another set of standards in approving or disapproving applications of all other applicants for registration as voters in Marshall County." *Id*. at 18. At the time, the registration form contained a section which asked questions designed to elicit information as to the applicant's other possible residences, including: the address on the applicant's driver's license, the applicant's phone number and location, the name and location of the applicant's church, the address on the applicant's most recent tax return, and the location of the applicant's personal possessions. *Id*. State law provided that if the applicant answered 3 or more of the 9 questions in a way that

11

indicated a location other than the applicant's claimed residence for registration, the registrar was required to reject the form. *Id.* In a nearly 7-month period, the registrar had disapproved and referred to the board of election commissioners the registration forms of every individual "who listed upon the application his or her address as Rust or Mississippi Industrial Colleges and whose previous address was in any county other than Marshall." *Id.* 47 of the 60 referred applicants were ultimately rejected by the board. *Id.* at 18. Of these 60 total applicants, at least 29 had answered fewer than 3 of the 9 questions in Item 7 in a way that indicated a different location for registration purposes. *Id.*

During the same time period, non-student registrants faced different scrutiny and standards: "[T]he registrar approved for registration without referral seventy-three non-student applicants who answered three or more questions in item seven of the application form in a manner indicating a residence other than Marshall County." *Id.* at 19. This of course violated Mississippi law which mandated the rejection of those 73 forms. The court found that this "establishe[d] the use by the registrar of an obviously different standard from that which he employed in disposing of student applications." *Id.* The court found a violation of 52 U.S.C. § 10101(a)(2)(A) and granted plaintiffs injunctive relief requiring "uniform standards" for all voter registration applicants. *Id.* at 20; *see also Shivelhood v. Davis*, 336 F. Supp. 1111, 1115 (D. Vt. 1971) (citing Section 10101(a)(2)(A) to block local election authority from "requir[ing] students to fill out a supplemental questionnaire involving questions concerning their domicile unless all applicants are required to complete the same questionnaire").

Given the documented discriminatory treatment of naturalized and native-born voter registration applicants in Louisiana, Plaintiffs are likely to succeed on the merits of Count Two.

> **c. Plaintiffs Are Likely to Succeed on the Merits of Their Elections Clause Preemption Claim.**

The National Voter Registration Act ("NVRA") of 1993 was enacted to increase voter registration in a variety of ways.  52 U.S.C. § 20501(b)(1).  To accomplish this goal, the NVRA mandated the creation of the Federal Form, which can be used to register to vote anywhere in the United States, with only a few states exempted.  52 U.S.C. §§ 20505(a)(1), 20503(b).[8]  States are required to "accept and use" this uniform Federal Form to register voters.   52 U.S.C. § 20505(a)(1).   The U.S. Election Assistance Commission ("EAC") is charged with developing and updating this form in consultation with state election officials.  52 U.S.C. § 20508(a)(2).

The NVRA dictates the content of the Federal Form, setting a limit on the information the form may require registrants to provide in order to reduce barriers to voter registration.  More specifically, the Federal Form "may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."   52 U.S.C. § 20508(b)(1); *see also* 11 C.F.R. § 9428.4.   In addition to a U.S. citizenship question with Yes and No checkboxes at the top,[9] the General Instructions state: "All States require that you be a United States citizen by birth or naturalization to register to vote in federal and State elections. Federal law makes it illegal to falsely claim U.S. citizenship to register to vote in any federal, State, or local election."[10]  The Federal Form also "include[s] a statement that—(A) specifies each eligibility requirement (including citizenship); (B) contains an attestation that the applicant meets each such requirement; and (C) requires the signature of the

---

[8] *See* National Mail Voter Registration Form, *available at* http://www.eac.gov/voter_resources/register_to_vote.aspx (last visited Dec. 14, 2015); 11 C.F.R. § 9428.3.  The Federal Form has been translated into nine languages, including Spanish and Vietnamese.  States with no voter registration requirement (only North Dakota) and states which had Election Day registration in effect continuously on and after August 1, 1994, are exempt from the NVRA. 52 U.S.C. § 20503(b).
[9] *See supra* n.8.
[10] *Id*. at 1.

applicant, under penalty of perjury." *Id.* § 20508(b)(2).  The final sentence in the attestation is: "If I have provided false information, I may be fined, imprisoned, or (if not a U.S. citizen) deported from or refused entry to the United States."[11]  Notably, the NVRA explicitly prohibits the inclusion of any "requirement for notarization or other formal authentication" on the Federal Form, which furthers the legislative purpose of maximizing voter registration with more efficient methods. *Id.* § 20508(b)(3).

Congress passed the NVRA with the belief that the above safeguards were sufficient to prevent ineligible individuals from registering to vote.  In fact, the conference committee rejected language from the Senate version allowing states to require documentary proof of citizenship.  The committee concluded that such proof is "not necessary or consistent with the purposes of this Act" and that allowing states to require such proof "could effectively eliminate, or seriously interfere with, the mail registration program of the Act… [and] adversely affect the administration of the other registration programs as well."  H.R. REP. NO. 103-66, at 23-24 (1993) (Conf. Rep.).

Significantly, the Federal Form also contains state-specific instructions which are only added after the EAC approves a state election official's request.  State election officials were first required to submit state-specific information within 30 days of July 25, 1994.  11 C.F.R. § 9428.6(a).  State election officials are obligated to notify the EAC of any changes to a state's voter eligibility requirements within 30 days of such a change.  11 C.F.R. § 9428.6(c).

Congress passed the NVRA pursuant to the Elections Clause of the U.S. Constitution: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."  U.S. CONST. art. I,

---

[11] *See supra* n.8.

§ 4, cl. 1.  Federal law enacted pursuant to the Elections Clause displaces and preempts inconsistent state laws.  *Foster v. Love*, 522 U.S. 67, 69-73 (1997); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995); *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *Ex Parte Siebold*, 100 U.S. 371, 384 (1879).

Most recently, the Supreme Court held in *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247 (2013), that a state may not impose a documentary proof of citizenship requirement on registrants using the Federal Form created pursuant to the NVRA.  *Id*. at 2260.  Citing 52 U.S.C. § 20505(a)(1)'s mandate that states "accept and use" the Federal Form, Justice Scalia wrote:

> [T]he fairest reading of the statute is that a state-imposed requirement of evidence of citizenship not required by the Federal Form is "inconsistent with" the NVRA's mandate that States "accept and use" the Federal Form. *Siebold, supra*, at 397. If this reading prevails, the Elections Clause requires that Arizona's rule give way.

*Id*. at 2257.  Arizona argued that without the documentary proof of citizenship requirement, it would be deprived of information necessary to enforce its voter qualifications.  *Id.* at 2258-59.  The Court rejected this argument, reasoning that "the Federal Form provides a backstop: No matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be available."  *Id*. at 2255.  If the state were permitted to require documentary proof of citizenship of registrants using the Federal Form or "every additional piece of information the State requires on its state-specific form," the Federal Form would "cease[ ] to perform any meaningful function" and undermine the NVRA's goal of increasing the number of registered voters.  *Id*. at 2256.  The Court did note that state officials are entitled to request that the EAC alter the Federal Form's state-specific instructions to add a documentary proof of citizenship requirement and may seek to reverse any denial by filing suit.  *Id*. at 2259-60.  However, Defendants here have made no such request and the Federal

Form's Louisiana-specific instructions do not mention a proof of citizenship requirement; nor does the form itself request the applicant's place of birth.

Louisiana state and local election officials continue to require Federal Form registrants to identify their place of birth and, if they are naturalized citizens, provide documentary proof of citizenship. Ex. 1 (Mai Decl.) ¶¶ 6-12 & Exs. C, D; Ex. 5 (Tran Decl.) ¶¶ 3-5; Ex. 13 (Sherman Decl.) ¶¶ 5-7. Accordingly, the application of Louisiana's proof of citizenship requirement to naturalized U.S. citizens using the Federal Form to register to vote is preempted by the NVRA, as mandated by the Elections Clause. In light of *Arizona v. ITCA* and the fact that Louisiana officials have never sought (let alone obtained) the inclusion of its documentary proof of citizenship in the Federal Form instructions, Plaintiffs have a likelihood of success on the merits of Count Three.

## 3.   OTHER FACTORS IN SUPPORT OF A PRELIMINARY INJUNCTION

For an injunction to issue, Plaintiffs must also establish that they will suffer irreparable harm in the absence of preliminary relief, that the balance of equities weighs in their favor, and that an injunction is in the public interest. *Winter*, 555 U.S. at 20; *Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011). As set forth below, Plaintiffs satisfy all three of these elements.

### a.   Plaintiffs Will Suffer Irreparable Harm Absent an Injunction.

Absent a preliminary injunction, Plaintiffs and other naturalized U.S. citizens in Louisiana will continue to face barriers interfering with and blocking their right to vote, resulting in irreparable harm to their right to participate in upcoming elections in Louisiana. Defendants' enforcement of Section 18:105(B) has already prevented Plaintiffs Mai, Flores and Mansilla from voting in the 2015 Louisiana gubernatorial and 2016 primary elections because Defendants and their agents did not register Plaintiffs upon receiving their voter registration applications

because Plaintiffs are naturalized citizens born outside the United States.  Ex. 1 (Mai Decl.) ¶ 4-10; Ex. 2 (Flores Decl.) ¶¶ 6-12; Ex 3 (Mansilla Decl.) ¶¶ 4-9.  The general election, including presidential and Congressional elections, will be held on November 8, 2016, and the registration deadline is October 11, 2016.  LA. REV. STAT. ANN. § 18:135.

Proving citizenship "intimidate[s]" potential voters in the communities served by Plaintiff VAYLA and prevents many from registering to vote due to "lack of transportation, the language barriers and the lack of financial resources."  *See* Ex. 4 (Nguyen Decl.) at ¶¶ 14-15.  Proving citizenship also "isolates people" and "discourages them from participating" such that "people were not registering to vote because of the proof of citizenship law."  *See* Ex. 6 (Hernandez Decl.) at ¶ 15.  Therefore, in the absence of an injunction, many people in the communities served by Plaintiff VAYLA and Puentes will not register to vote due to Section 18:105(B).  Once an election is held, there is no way for a disenfranchised individual's vote to be cast and counted.

Louisiana's proof of citizenship requirement expressly and invidiously discriminates based on national origin in violation of the Equal Protection Clause.  Plaintiffs Mai, Flores, and Mansilla are treated worse than native-born U.S. citizens because they are naturalized citizens.  It is well-established that violation of a constitutional right constitutes irreparable harm requiring the issuance of a preliminary injunction.  *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *De Leon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014) *aff'd De Leon v. Abbott,* 791 F.3d 619 (5th Cir. 2015).

Numerous courts have held that the denial or abridgment of the right to vote is an irreparable injury because there is no way to cure the violation after the election.  "When constitutional rights are threatened or impaired, irreparable injury is presumed.  A restriction on the fundamental right to vote therefore constitutes irreparable injury."  *Obama for America v.*

*Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (citations omitted) (affirming preliminary injunction against law which imposed shorter in-person early voting period for nonmilitary Ohio voters than for military voters); *see also U.S. Student Association Foundation v. Land*, 585 F. Supp. 2d 925, 943-44 (E.D. Mich. 2008) (finding irreparable injury and enjoining a policy of rejecting voter registration applications when identification is returned as undeliverable); *Cardona v. Oakland Unified Sch. Dist.*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) (citing *Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986)) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury.").   Likewise, restrictions that impede organizational Plaintiffs' efforts to register community members to vote cannot be remedied after an election.   "[W]hen a plaintiff loses an opportunity to register a voter, the opportunity is gone forever."   *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012); *see also League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1339 (S.D. Fla. 2006) (granting preliminary injunction).   Similarly, enforcement of a preempted law may cause irreparable injury.   *Villas at Parkside Partners v. City of Farmers Branch*, 496 F. Supp. 2d 757, 776 (N.D. Tex. 2007) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)).   Finally, money damages will not be available to compensate Plaintiffs should they prevail.   If ultimately successful in their challenge to Defendants' law, Plaintiffs would be precluded under the Eleventh Amendment from an award of money damages to remedy the harm they suffered from discriminatory voter registration procedures.   *See Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991) (Eleventh Amendment bar against retroactive damages "clearly establishes that any legal remedy is unavailable and that the only relief available is equitable in nature").   Even if available, money damages could not make a disenfranchised voter whole.

**b.   The Balance of Equities Strongly Favors the Issuance of an Injunction.**

Plaintiffs must also show "that the hardship exacted upon them in the absence of preliminary injunctive relief exceeds the defendants' burden if relief were granted."  *Black Fire Fighters Ass'n of Dallas v. City of Dallas, Tex.*, 905 F.2d 63, 65 (5th Cir. 1990).  Here, the balance of equities weighs in favor of a preliminary injunction.  A citizen has a fundamental interest in participating in the core right of democracy, the right to vote.  *See Illinois Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184 (1979) ("[V]oting is of the most fundamental significance under our constitutional structure."); *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964) ("[T]he right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."); *Hatten*, 854 F.2d at 694 ("There is no question that the rights to vote and to associate are fundamental.").  If Defendants continue to discriminate against naturalized U.S. citizens, some, if not most, of them will be unable to complete the voter registration process and vote in the upcoming general election. Similarly, organizational Plaintiff VAYLA has an interest in ensuring members of its community can exercise their right to vote, and the voters' right to cast a ballot is fundamental.

A threatened injury to deprive Plaintiffs of the fundamental right to vote outweighs any harm an injunction could cause Defendants, who have no legally cognizable interest in enforcing an unconstitutional or preempted law.  *Murphree v. Winter*, 589 F. Supp. 374, 382 (S.D. Miss. 1984) ("The fundamental right to vote is one of the cornerstones of our democratic society. The threatened deprivation of this fundamental right can never be tolerated.").  Defendants cannot reasonably claim that the proof of citizenship requirement is essential to protecting electoral integrity because the law arbitrarily exempts all native-born U.S. citizens.  The law is manifestly

19

not designed to further a legitimate state interest, let alone a compelling one.   Furthermore, enjoining this arbitrary requirement will reduce the administrative burden on parish Registrar of Voters offices because injunctive relief would simply command Defendants to instruct parish Registrars to stop requiring documentary proof of citizenship from naturalized applicants.

### c.   A Preliminary Injunction Will Serve the Public Interest.

An injunction preventing the enforcement of an unconstitutional law serves the public interest, particularly where civil rights are at stake.  *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 93 (5th Cir. 1992) ("'[T]he public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve.'"); *De Leon*, 975 F. Supp. 2d at 665 ("[A] preliminary injunction preventing the enforcement of an unconstitutional law serves, rather than contradicts, the public interest.").  Here, the public interest is served by enjoining the continued enforcement of Louisiana's proof of citizenship law which violates the U.S. Constitution and federal law.

Finally, "[t]he right to vote on an equal basis with other citizens is a fundamental right in a free society."  *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973).  The "public interest . . . does not extend so far as to allow . . . actions that interfere with the exercise of fundamental rights." *Deerfield Med. Ctr.*, 661 F.2d at 338-39.   An injunction in this case will further the public interest in protecting one of the most fundamental rights in our society by allowing all U.S. citizens to register and vote on an equal basis regardless of how they became U.S. citizens.

### 4.  CONCLUSION

In light of the foregoing, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for a preliminary injunction against the enforcement of LA. REV. STAT. ANN. § 18:105(B).

DATED: May 4, 2016                          Respectfully submitted,

                                            */s/ Sara H. Godchaux*
                                            Sara H. Godchaux
                                            Louisiana Bar No. 34561
                                            Southern Poverty Law Center
                                            1055 St. Charles Avenue, Suite 505
                                            New Orleans, LA 70130
                                            sara.godchaux@splcenter.org
                                            Phone: (504) 486-8982, ext. 225
                                            Fax: (504) 486-8947

                                            Naomi Tsu*
                                            GA Bar No. 507612
                                            Southern Poverty Law Center
                                            1989 College Ave.
                                            Atlanta, GA 30317
                                            naomi.tsu@splcenter.org
                                            Phone:  (404) 521-6700
                                            Fax:  (404) 221-5847

                                            Jon Sherman*
                                            D.C. Bar No. 998271
                                            New York Bar No. 4697348
                                            Brittnie Baker**
                                            D.C. Bar Application Pending
                                            Florida Bar No. 0119058
                                            Fair Elections Legal Network
                                            1825 K St. NW, Suite 450
                                            Washington, DC 20006
                                            jsherman@fairelectionsnetwork.com
                                            bbaker@fairelectionsnetwork.com
                                            Phone: (202) 331-0114
                                            Fax: (202) 331-1663

                                            *Application Pending to be Admitted Pro
                                            Hac Vice to Practice in the United States
                                            District Court for the Middle District of
                                            Louisiana

                                            **Application Pending to be Admitted Pro
                                            Hac Vice to Practice in the United States
                                            District Court for the Middle District of
                                            Louisiana and Working Under the Direct
                                            Supervision of an Enrolled, Active Member
                                            of the District of Columbia Bar